UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ALBERTO RAMOS, <br><br> Plaintiff <br><br> v. <br><br> SCOTT ERWIN, JENNIFER GILBREATH, HALLIE SMITH, FREDRICK MORRISON, and GINO DAGO <br><br><br> Defendants. | Case No. 4:23-cv-2517 <br><br> **JURY DEMAND** |

# COMPLAINT

1. Plaintiff Alberto Ramos ("Mr. Ramos") brings this 42 U.S.C. § 1983 action against officers of Houston Police Department ("HPD") who racially profiled, physically assaulted, and used a deadly four-point restraint maneuver (commonly known as "hogtying," or a "hobble") on a medically vulnerable person based solely on his appearance as a Hispanic male. Mr. Ramos is a Houston resident and a loving son, sibling, and uncle.

2. Early in the morning on July 11, 2021, Defendant Scott Erwin was notified of a 911 call alleging that a "Hispanic" male had committed an assault. Shortly thereafter, Defendant Erwin saw Mr. Ramos, who is a Hispanic male, on a public sidewalk. Mr. Ramos was not committing any crimes.

1

3. Apart from race and gender, Defendant Erwin did not receive any physical descriptors of the alleged perpetrator. Notably, 44.5% of Houstonians, or over 1 million people in the City of Houston, identify as Hispanic or Latino.[1]

4. Despite having only those two pieces of relevant information about Mr. Ramos, Defendant Erwin seized Mr. Ramos within seconds of getting out of his police vehicle. Without asking questions or giving Mr. Ramos an opportunity to answer, he grabbed Mr. Ramos' arm and tackled him to the ground.

5. Shortly thereafter, Defendant Jennifer Gilbreath arrived on the scene, sat on top of Mr. Ramos, and helped Defendant Erwin place handcuffs on Mr. Ramos. Mr. Ramos cried out in confusion, distress, and pain, asking the officers to stop and let him go. In response, Defendant Gilbreath threatened to tase Mr. Ramos' bare chest.

6. Several additional Defendants then arrived on the scene and placed Mr. Ramos, who was still in handcuffs, in a police vehicle. Officers made several comments on the scene and in police reports about Mr. Ramos' deteriorating mental state and repeated complaints of pain.

7. Later, Defendants Gino Dago, Hallie Smith, and Fredrick Morrison pulled an already-handcuffed Mr. Ramos out of the police vehicle, placed him on his stomach, and tied his wrists and his ankles in a four-point restraint known as hogtying. Defendants did this despite their audible observations of Mr. Ramos' fragile condition.

---

[1] "U.S. Census Bureau Quickfacts: Houston City, Texas." *United States Census Bureau*, www.census.gov/quickfacts/fact/table/houstoncitytexas/RHI725222.

2

8. Mr. Ramos had to be hospitalized for the injuries that he received as a result of being hogtied. Even now, he continues to suffer serious and long-term mental and emotional consequences.

9. The practice of hogtying a person who police believe to be experiencing medical or mental comorbidities has been unambiguously banned in the Fifth Circuit for at least 25 years.[3]

10. The Department of Justice has warned police departments of the danger and potential deadliness of hogtying a person who is experiencing medical and mental comorbidities for at least 28 years.[4] According to a report by the Marshall Project, at least 23 people nationwide died as a result of hogtying between 2010 and 2021.[5]

## PARTIES

11. Plaintiff Alberto Ramos ("Mr. Ramos") is a Houston resident.

12. Defendants Scott Erwin, Jennifer Gilbreath, Hallie Smith, Fredrick Morrison, Gino Dago, (collectively, "Defendants") are Houston Police Department ("HPD")

---

[2] Cropped illustration of hogtying. Siegel, Emily R., and Joseph Neff. "'He Died like an Animal': Some Police Still Hogtie People despite Risk." *NBCNews.Com*, 24 May 2021, www.nbcnews.com/news/us-news/he-died-animal-some-police-still-hogtie-people-despite-risks-n1268032.

[3] *Gutierrez v. City of San Antonio,* 139 F.3d 441, 446–47 (5th Cir. 1998)

[4] U.S. Department of Justice. *Positional Asphyxia—Sudden Death*, July 1995, www.ojp.gov/pdffiles/posasph.pdf.

[5] Siegel, Emily R., and Joseph Neff. "'He Died like an Animal': Some Police Still Hogtie People despite Risk." *NBCNews.Com*, 24 May 2021, www.nbcnews.com/news/us-news/he-died-animal-some-police-still-hogtie-people-despite-risks-n1268032.

officers who acted within the scope of their employment and under the color of law during the events at issue. They are sued in their individual capacities.

## JURISDICTION AND VENUE

13. Mr. Ramos brings this action under the Fourth and Fourteenth Amendments to the United States Constitution, as authorized by 42 U.S.C. § 1983.

14. The Court has jurisdiction over Mr. Ramos' claims under 28 U.S.C. §§ 1331(action arising under the Constitution and federal law) and 1343(a) (action to redress deprivation of civil rights).

15. Venue is proper under 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and all Defendants are residents of Texas, or, alternatively, because the events or omissions giving rise to Mr. Ramos' claims occurred in this district.

## STATEMENT OF FACTS

**A. Defendants seized Mr. Ramos based solely on his race and sex.**

16. On July 11, 2021, defendant Scott Erwin ("Defendant Erwin") was notified of a 911 call alleging that a "Hispanic" male had committed an assault against a "Hispanic" female. The 911 caller described both the male and female as "drunk."

17. Defendant Erwin did not receive any physical descriptors of the alleged perpetrator besides the person's Hispanic race and male sex. Defendant Erwin did not receive a description of the alleged perpetrator's height, weight, clothing, hair color, or any other physical characteristics.

18. In other words, the physical description that Defendant Erwin received was solely based on race and sex.

19. Any person who was both Hispanic and male would have matched the description that Defendant Erwin received.

20. Defendant Erwin began driving down the street in Montrose to respond to the 911 call. Shortly thereafter, people on the street flagged him down. Defendant Erwin stopped his police vehicle and rolled down his window to listen.

21. The people on the street told Defendant Erwin that the alleged perpetrator was only verbally arguing and not physically fighting. Defendant Erwin repeated the information about the alleged altercation only being an argument to dispatch.

22. Defendant Erwin drove a bit further and saw Mr. Ramos, who is a Hispanic male, on a public sidewalk by himself.

23. Mr. Ramos was not arguing with anyone, engaged in an altercation, or committing a crime when Defendant Erwin saw him.

24. Mr. Ramos was unarmed, a fact that was visibly apparent to Defendant Erwin because Mr. Ramos was shirtless.

25. There was no Hispanic female on the scene when Defendant Erwin saw Mr. Ramos.

26. The 911 caller was not on the scene when Defendant Erwin saw Mr. Ramos.

27. The only information linking Mr. Ramos to the 911 call was his race and sex.

28. Defendant Erwin did not have a description of any other physical characteristics to compare to Mr. Ramos' physical appearance, such as height, weight, clothing, or hair color.

29. Regardless, Defendant Erwin pulled alongside Mr. Ramos in his vehicle and asked Mr. Ramos to tell his "side of the story."

30. Defendant Erwin did not ask any specific investigative questions related to the 911 call while he drove next to Mr. Ramos in his police vehicle.

31. Mr. Ramos, who was walking home after enjoying a night out dancing with his sisters, did not understand what "story" Defendant Erwin was talking about.

32. Defendant Erwin then got out of his police vehicle and walked toward Mr. Ramos.

33. Defendant Erwin commanded Mr. Ramos to stop moving away from him.

34. Mr. Ramos complied with Defendant Erwin's command and stopped moving.

35. Mr. Ramos showed no physical aggression towards Defendant Erwin when he complied with Defendant Erwin's command.

36. Defendant Erwin told dispatch that Mr. Ramos complied with his command to stop moving.

37. Despite Mr. Ramos' full cooperation, Defendant Erwin suddenly grabbed Mr. Ramos' arm and began tackling him to the ground.

38. Mere seconds passed between the time when Defendant Erwin got out of his police vehicle and the moment he grabbed Mr. Ramos' arm.

39. Defendant Erwin grabbed Mr. Ramos' arm and began tackling him to the ground before asking any investigatory questions related to the 911 call or taking any investigative steps, such as asking for identification.

40. Defendant Erwin did not observe a crime–or even an argument or altercation–and did not take any investigative steps prior to physically assaulting Mr. Ramos. The only basis for Defendant Erwin's conduct was Mr. Ramos' race and sex.

**B. Defendants arrested Mr. Ramos without probable cause and with disproportionate force.**

41. Shortly after Defendant Erwin assaulted Mr. Ramos, Defendant Gilbreath appeared on the scene.

42. The Defendants still only had a physical description that was based on race and sex.

43. There was still no Hispanic female on the scene.

44. There was still no 911 caller on the scene.

45. Defendant Gilbreath did not ask any investigative questions upon her arrival.

46. Nevertheless, Defendant Gilbreath began to help Defendant Erwin tackle Mr. Ramos to the ground immediately after she arrived on scene.

47. Mere seconds passed between the time when Defendant Erwin exited his police vehicle and the time when Defendant Gilbreath helped him tackle Mr. Ramos to the ground.

48. Once Defendants Gilbreath and Erwin got Mr. Ramos to the ground, Defendant Gilbreath sat on top of Mr. Ramos.

49. Defendants Gilbreath and Erwin proceeded to handcuff Mr. Ramos.

50. Mr. Ramos, who was confused, distressed, in pain, and scared, repeatedly cried "Stop" and "Let me go."

7

51. Only after Defendants had already sat on top of Mr. Ramos did Defendant Erwin ask Mr. Ramos, "Where's that girl you were talking with?"

52. Defendant Erwin did not reference any of the 911 call's allegations when he asked Mr. Ramos that question.

53. Mr. Ramos - who had just enjoyed a night out dancing with his sisters and was confused about why he was handcuffed - did not know about the alleged events leading to the 911 call. Mr. Ramos therefore responded, "She's my sister."

54. None of Mr. Ramos' sisters were on the scene.

55. With a physical description that was solely based on race and sex, no Hispanic female on the scene, no verification of Mr. Ramos' identity, no investigative questions, and no 911 caller on the scene, the only observable evidence that Defendants could have used to arrest Mr. Ramos in connection with the 911 call was his race and sex.

56. Instead of taking any investigative steps at all, Defendants Gilbreath and Erwin immediately resorted to using overwhelming force on a person who simply fit the description of being Hispanic and male.

57. The officers obtained no evidence that Mr. Ramos had assaulted his sister or any other Hispanic female.

58. Mr. Ramos was never criminally charged for allegations in the 911 call.

**C. Defendants used disproportionate and dangerous force when they hogtied Mr. Ramos.**

59. After Defendants Erwin and Gilbreath tackled and handcuffed Mr. Ramos, Defendants put Mr. Ramos into an HPD police car.

60. At this point, there were at least 11 officers on the scene.

8

61. Mr. Ramos was handcuffed, unarmed, secured inside of a police vehicle, and outnumbered by at least 11 to 1.

62. In other words, officers had sufficiently subdued Mr. Ramos. He did not pose a physical threat to them or to anyone else.

63. Although Mr. Ramos was physically subdued, he was in extreme emotional distress. Mr. Ramos was crying loudly for help, asking questions in confusion, and making nonsensical statements in both Spanish and English.

64. Mr. Ramos' emotional delirium was so heightened that it appeared to have physical effects on his body. During his arrest, Mr. Ramos was sweating profusely and alternated between hyperventilating and slow, labored, coarse-sounding breaths.

65. Defendant Erwin made comments on the scene about Mr. Ramos' obviously unhealthy emotional and physical states.

   a. Defendant Erwin stated out loud during the arrest that he thought Mr. Ramos' mental state was deteriorating.

   b. Defendant Erwin stated out loud during the arrest that he thought Mr. Ramos might be experiencing an overdose.

66. Several Defendants made statements in subsequent incident reports and probable cause determinations indicating that they thought Mr. Ramos was under the influence of an unknown substance at the time of his arrest.

   a. The probable cause determination for Defendant Gilbreath's criminal complaint states that Mr. Ramos "appeared to be under the influence of some unknown drug."

9

    b. The probable cause determination for Defendant Morrison's criminal complaint states that Mr. Ramos "appeared to be under the influence of some unknown drug."

    c. The probable cause determination for Defendant Smith's criminal complaint states that Mr. Ramos "appeared to be under the influence of some unknown drug."

    d. The probable cause determinations for all three of the aforementioned Defendants' criminal complaints state that Mr. Ramos was "swe[a]ting profusely."

67. Despite believing that Mr. Ramos was in a fragile physical and mental state, and despite having already subdued Mr. Ramos by handcuffing him and securing him in a police car, Defendants proceeded to escalate their use of force against him.

68. At some point, Defendants placed a spit mask on Mr. Ramos.

69. Mr. Ramos remained distraught and continued to act erratically while handcuffed in the back of the police vehicle, but was at no point a threat to the officers.

70. Defendants Smith, Dago, and Morrison proceeded to pull a handcuffed Mr. Ramos out of the police vehicle where they had already secured him.

71. Defendants then laid an already-handcuffed Mr. Ramos on his stomach.

72. Defendants then placed leg restraints on an already-handcuffed Mr. Ramos.

73. Defendants then attempted to tie Mr. Ramos' handcuffs to his leg restraints, but failed.

74. Mr. Ramos screamed in pain as Defendants made this failed attempt.

75. Defendants then attempted to tie Mr. Ramos' handcuffs to his leg restraints again and succeeded.

76. Defendants Dago, Smith, and Morrison hogtied Mr. Ramos.

77. For at least 28 years, the United States Department of Justice has warned police departments that positional asphyxia—which is sudden death from suffocation—can happen when officers hogtie a medically vulnerable person.[6]

78. Defendants should have known that they were prohibited from hogtying a person whom they believed was experiencing physical and mental comorbidities because the Fifth Circuit held, 25 years ago, that "hog-tying may create a substantial risk of death or serious bodily injury" and in certain circumstances "violate[s] law clearly established" in Texas.[7]

79. Defendants should have known about the deadliness of hogtying a person experiencing physical and mental comorbidities because, according to a report by the Marshall Project, at least 23 people nationwide died as a result of hogtying between 2010 and 2021.[8]

80. Mr. Ramos had to be hospitalized for the injuries he received as a result of Defendants hogtying him.

81. Mr. Ramos had trouble breathing while hogtied.

82. Mr. Ramos' arm and ribcage were severely bruised and injured as a result of Defendants hogtying him.

---

[6] NAT'L INSTITUTE OF JUSTICE, POSITIONAL ASPHYXIA—SUDDEN DEATH (July 1995), https://www.ojp.gov/pdffiles/posasph.pdf.
[7] *Gutierrez v. City of San Antonio,* 139 F.3d 441, 446–47 (5th Cir. 1998).
[8] Emily R. Siegel & Joseph Neff. *'He died like an animal': Some police still 'hogtie' people despite risks*, NBC NEWS (May 24, 2021), https://www.nbcnews.com/news/us-news/he-died-animal-some-police-still-hogtie-people-despite-risks-n1268032.

11

**D. Through all of their actions, Defendants caused Mr. Ramos extreme trauma and harm.**

83. By their actions, Defendants caused Mr. Ramos emotional distress, fear, embarrassment, humiliation, reputational damage, inconvenience, and physical pain.

84. By their actions, Defendants deeply traumatized Mr. Ramos. The trauma that Defendants caused permeates into Mr. Ramos' personal and professional life.

## CLAIMS FOR RELIEF

### COUNT I: Arresting Mr. Ramos Without Probable Cause in Violation of the Fourth Amendment 42 U.S.C.§ 1983

85. Mr. Ramos realleges and incorporates by reference the allegations set forth in paragraphs 1-84 above as if fully set forth herein.

86. As the Fifth Circuit has proclaimed:

> Reasonable suspicion to stop someone suspected of criminal activity is a low threshold, but…[o]ur cases require officers to have information more specific than 'a Hispanic male . . . ,'" especially in [the Southern District of] Texas. That open-ended description would effectively authorize random police stops, something the Fourth Amendment abhors.

*United States v. Alvarez,* 40 F.4th 339, 348 (5th Cir. 2022) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

87. Defendants Erwin and Gilbreath arrested Mr. Ramos solely because he fit the general and overbroad description of "Hispanic male."

88. When Defendants Erwin and Gilbreath engaged Mr. Ramos, they had no information about who he was, what he had been doing that night, or whether he had broken any laws. Mr. Ramos was neither armed nor committing any crimes at the time Defendants first saw him.

89. No reasonable officer could have believed there was probable cause to arrest Mr. Ramos under such circumstances.

90. Despite this lack of probable cause, Defendants Erwin and Gilbreath arrested Mr. Ramos within seconds of approaching him.

91. Mr. Ramos was never charged with any crimes relating to the allegations in the 911 call. Defendants, acting under color of state law, directly and proximately caused the violation of Mr. Ramos' clearly established Fourth Amendment right to be free from arrest without probable cause and ensuing compensable injuries.

92. Defendants' actions were willful, deliberate, and malicious; involved reckless or callous indifference to Mr. Ramos' rights; and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

**COUNT II: Using Excessive Force Against Mr. Ramos When Hogtying Him in Violation of the Fourth Amendment 42 U.S.C.§ 1983**

93. Mr. Ramos realleges and incorporates by reference the allegations set forth in paragraphs 1-84 above as if fully set forth herein.

94. Mr. Ramos posed no immediate safety threat because he was already handcuffed and secured in a police vehicle before Defendants decided to hogtie him.

95. Mr. Ramos was exhibiting such severe emotional and physical distress that several Defendants made statements on the arrest scene and in subsequent reports that they thought he was under the influence of an unknown substance.

96. As stated in paragraphs 16-58, Defendants did not have probable cause to arrest Mr. Ramos in the first instance.

97. Mr. Ramos had to be hospitalized for the severe injuries he received as a result of being hogtied.

98. Defendants, acting under color of state law, directly and proximately caused the violation of Mr. Ramos' clearly established Fourth Amendment right to be free from excessive force and ensuing compensable injuries.

99. Defendants' actions were willful, deliberate, and malicious; involved reckless or callous indifference to Mr. Ramos' rights; and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

**COUNT III: Using Excessive Force Against Mr. Ramos When Tackling Him At the Beginning of his Arrest in Violation of the Fourth Amendment 42 U.S.C. § 1983**

100. Mr. Ramos realleges and incorporates by reference the allegations set forth in paragraphs 1-84 above as if fully set forth herein.

101. As stated in paragraphs 16-58, Defendants did not have probable cause to arrest Mr. Ramos. He was not engaged in criminal conduct, did not have a weapon, and was not behaving in a threatening manner.

102. In addition, when Defendant Erwin ordered Mr. Ramos to stop moving, he peacefully complied. Mr. Ramos did not flee or attempt to flee.

103. Nevertheless, Defendants grabbed, tackled, and handcuffed Mr. Ramos within mere seconds of approaching him.

104. Defendants, acting under color of state law, directly and proximately caused the violations of that clearly established Fourth Amendment right to be free from excessive force and ensuing compensable injuries.

105. Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Mr. Ramos' rights, and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

## **REQUEST FOR RELIEF**

106.  Defendants' flagrant disregard for their professional obligations, the rule of law, and Mr. Ramos' basic dignity led to very real pain, fear, and material costs for Mr. Ramos. Mr. Ramos now asks the Court to enter a judgment confirming that Defendants are not above the laws they enforce, and that they will be held accountable for abusing their authority

107.  WHEREFORE, on the basis of the foregoing, Mr. Ramos demands a jury trial for all issues so triable pursuant to the Seventh Amendment of the United States Constitution and Federal Rules of Civil Procedure, and requests that this Court issue the following relief:

   a. Declare that Defendants violated Mr. Ramos' constitutional rights;
   b. Award compensatory damages against Defendants in an amount to be determined by a jury at trial;
   c. Award punitive damages against Defendants for their willful and egregious violations of the law in an amount to be determined by a jury at trial;
   d. Award reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and award such other relief as the Court deems just and proper.

Respectfully submitted, this 10th day of July, 2023

/s/ Kiah Duggins
Caitlin Halpern (Texas Bar No. 24116474; S.D. Tex. Bar No. 3454643)*
caitlin.halpern@gmail.com
4416 Bell Street
Houston, TX 77023
Telephone: (571) 215-2002

Kiah Duggins (*pro hac vice* forthcoming)
Washington, D.C. Bar No. 1779266
Kiah@civilrightscorps.org
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
Telephone: (202) 844-4975

*Attorney-in-Charge