United States District Court
Southern District of Texas
**ENTERED**
March 19, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **ALBERTO RAMOS,** § | |
| § | |
| **Plaintiff,** § | |
| § | **CIVIL ACTION NO. 4:23-cv-2517** |
| **VS.** § | |
| § | |
| **SCOTT ERWIN *et al*,** § | |
| § | |
| **Defendants.** § | |

## MEMORANDUM & ORDER

This is a § 1983 suit arising from Plaintiff Alberto Ramos' encounter with five Houston Police Department Officers. Ramos brings claims for false arrest and excessive force. Before the Court are three Motions to Dismiss: one filed by Defendants Gino Dago and Scott Irwin,[1] ECF No. 12, one filed by Defendants Hallie Smith and Frederick Morrison, ECF No. 16, and one filed by Defendant Jennifer Gilbreath, ECF No. 29. The Motions are nearly identical in substance, and differ only to the extent that different officers were allegedly involved in different phases of the confrontation with Ramos.[2] For the reasons set forth below, the Court finds that the three Motions to Dismiss should be **DENIED IN PART**.

---

[1] The case caption lists "Scott Erwin" as a defendant. Upon filing his Motion to Dismiss, Mr. Irwin informed the Court of the correct spelling of his name. Defs. Dago and Irwin Mot. 1 n.1, ECF No. 12.

[2] Another minor difference is that Gilbreath's Motion was filed after the resolution of Ramos' charges in state criminal court whereas the other Defendants' Motions were filed before this resolution. The implications of the resolution of Ramos' charges are discussed in section III.A. *infra*.

1

I. **BACKGROUND**

At this stage, the Court accepts the well-pleaded facts alleged in Ramos' complaint as true, and views them in the light most favorable to Ramos. *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). When deciding a motion to dismiss, a court may also consider matters of public record. *Norris v. Hearst Tr.*, 500 F.3d 454, 461 (5th Cir. 2007); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994). Defendants included the indictments and probable cause findings related to Ramos' state criminal charges as exhibits to their Motions to Dismiss. ECF Nos. 12-1, 12-2, 16-1, 16-2, 16-3, 16-4, 16-5, 16-6, 29-1, 29-2. Defendant Gilbreath included Ramos' judgment of conviction as an exhibit to her Motion to Dismiss. ECF No. 29-3. Ramos filed a status report that included his judgment of acquittal as to two of the state court charges, and judgment of conviction as to the third. Pl.'s Status Report, Jan. 6, 2024, ECF No. 27. No parties have objected to the Court's consideration of these matters of public record. Accordingly, the Court finds that it may consider the referenced documents at this juncture. With those preliminary matters clarified, the Court will now summarize the relevant facts, as alleged in Ramos' complaint.

On the morning of July 11, 2021, Defendant Scott Irwin was notified of a 911 call alleging that a "Hispanic" male had committed an assault. Compl. ¶ 2, ECF No. 1. Irwin received no other physical descriptors of the alleged perpetrator. *Id.* at ¶ 3. When Irwin saw Ramos—a Hispanic man—walking on a public sidewalk by himself, he drove next to Ramos and asked him to tell his "side of the story." *Id.* at ¶ 29. Ramos was confused, as he had just enjoyed a night out dancing with his sisters. *Id.* at ¶ 31. Irwin then got out of his police vehicle and ordered Ramos to stop moving away from him. *Id.* at ¶ 32–33. Ramos complied with the order and stopped

moving. *Id.* ¶ 34–35. Then, Irwin "suddenly grabbed Ramos' arm and began tackling him to the ground." *Id.* at ¶ 37.

Shortly thereafter, Defendant Jennifer Gilbreath arrived on the scene, and helped Irwin tackle Ramos. *Id.* at ¶ 46. She then helped Irwin place handcuffs on Ramos. *Id.* ¶ 5. Ramos alleges that these events all happened "mere seconds" after Irwin initially approached him. *Id.* at ¶ 38, 103. Once he was placed in handcuffs, Ramos "cried out in confusion, distress, and pain, asking the officers to stop and let him go." *Id.* at ¶ 5. In response, Gilbreath threatened to tase Ramos' chest. *Id.*

At least nine other police officers then arrived on the scene and placed the handcuffed Ramos in the back of a police vehicle, while observing that Ramos' mental state was deteriorating and that he was repeatedly complaining that he was in pain. *Id.* at ¶ 6. At some point during the encounter, the officers placed a "spit mask" on Ramos. *Id.* at ¶ 68.

Later, Defendants Gino Dago, Hallie Smith, and Fredrick Morrison pulled Ramos out of the police vehicle and, as Ramos screamed out in pain, the officers hogtied him—that is, they placed him on his stomach and tied his wrists and ankles in a four-point restraint. *Id.* at ¶ 7, 71–76. Ramos had to be hospitalized for the injuries he received from being hogtied, and he continues to suffer serious mental and emotional consequences stemming from being hogtied. *Id.* at ¶ 8.

In addition to the facts alleged in Ramos' complaint, documents in the public record indicate that, following the above-described events, Ramos was charged with two counts of assault on an officer, as well as harassment of a public servant. *See* ECF No. 27. Following a jury trial in state criminal court, Ramos was found not guilty of assault on an officer, and guilty of

harassment of a public servant (namely, spitting on Gilbreath). *Id.* A state court judge sentenced him to two years of probation. *Id.*

Ramos brought 42 U.S.C. § 1983 claims against Defendants Irwin, Gilbreath, Smith, Morrison, and Dago, suing each officer in their individual capacity. *Id.* at ¶ 12. Ramos alleges violations of the Fourth and Fourteenth Amendments. *Id.* at ¶ 13. He seeks declaratory relief, in addition to compensatory and punitive damages, and reasonable fees and costs pursuant to 42 U.S.C. § 1988. Dago and Irwin filed a Motion to Dismiss on September 27, 2023. Smith and Morrison filed a Motion to Dismiss on October 16, 2023. Gilbreath filed a Motion to Dismiss on February 12, 2024. The three Motions each seek dismissal of all of Ramos' claims.

## II.      LEGAL STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This must be more than "[a]n unadorned, the-defendant-unlawfully-harmed-me accusation" or "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, a claim is plausible on its face only "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

In the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Lowrey v.*

*Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). "The motion to dismiss should not be granted unless the plaintiff would not be entitled to relief under any set of facts that he could prove consistent with the complaint." *Johnson*, 385 F.3d at 529.

### III.    ANALYSIS

Defendants urge dismissal based on two general grounds. First, Defendants argue that Ramos' claims are *Heck*-barred. Second, Defendants argue that they are entitled to qualified immunity.

#### A.  Whether Ramos' claims are *Heck*-barred

Defendants submit that Plaintiff's suit should be dismissed pursuant to the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court explained that § 1983 suits cannot proceed where "a judgment in favor of the plaintiff would necessarily imply the invalidity of [the § 1983 plaintiff's] conviction or sentence." *Id.* at 487. If a judgment in the § 1983 action would so imply, "the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.*

Ramos brings three § 1983 claims: false arrest and excessive force claims stemming from Defendants Irwin and Gilbreath tackling and arresting him seconds after seeing him, and an excessive force claim stemming from Defendants Dago, Smith, and Morrison hogtying him. Defendants originally pointed to the three criminal charge Ramos faced in connection with the events underlying his § 1983 suit to argue that his claims were *Heck*-barred. However, two of those charges resulted in acquittal, and therefore cannot bar Ramos' § 1983 claim. *See id.*; Pl.'s Status Report, Jan. 6, 2024 (Judgment of state criminal case). Still, Defendants contend that

Ramos' conviction for harassment of a public servant—namely, spitting on Gilbreath—requires this Court to dismiss the case. For the reasons that follow, the Court finds and holds that none of Ramos' claims are *Heck*-barred.[3]

1. **False arrest claim**

Ramos bases his § 1983 false arrest claim on allegations that Defendants Irwin and Gilbreath lacked probable cause when they arrested him following the 911 call "solely because he fit the general and overbroad description of 'Hispanic male.'" Compl. ¶ 87–90. Ramos never received criminal charges related to the 911 call, and his state criminal charge is based on conduct that occurred after his initial arrest. Therefore, a judgment in favor of Ramos as to his false arrest claim would not necessarily imply the invalidity of his state criminal conviction. This claim is not *Heck*-barred.

2. **Excessive force claims**

The Fifth Circuit has made clear that § 1983 excessive force claims are not *Heck*-barred where the alleged excessive force and alleged criminal misconduct occur at temporally distinct times. *Aucoin v. Cupil*, 958 F.3d 379, 382 (5th Cir. 2020) ("Put simply, there is no *Heck* bar if the alleged violation occurs 'after' the cessation of the plaintiff's misconduct that gave rise to his prior conviction."); *Poole v. City of Shreveport*, 13 F.4th 420, 426–27 (5th Cir. 2021) (holding that § 1983 excessive force claim was not *Heck*-barred as it was "temporally and conceptually distinct" from criminal offense); *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008) (concluding that § 1983 excessive force claim was not *Heck*-barred because the "excessive force occurred after the arrestee has ceased his or her resistance" and therefore did "not necessarily imply the

---

[3] In so holding, the Court rejects Defendants' argument that Ramos has judicially admitted to kicking and spitting on officers. Ramos' pleadings exclusively refer to the facts underlying his state criminal charges as "alleged." *See generally* ECF Nos. 20, 30.

invalidity of a conviction for the earlier resistance"); *Ballard v. Burton*, 444 F.3d 391, 400 (5th Cir. 2006) (holding that § 1983 excessive force claim was "conceptionally different" from simple assault conviction, and accordingly not *Heck* barred, where allegedly criminal conduct had ceased when officer used allegedly excessive force). The reasoning underlying these decisions is that if the factual bases for a § 1983 claim and criminal conviction are "temporally and conceptually distinct," a finding that the officer utilized excessive force is not necessarily inconsistent with a finding that the § 1983 plaintiff committed a crime. *Poole*, 13 F.4th at 426–27 (quoting *Bush*, 513 F.3d at 497).

Ramos' excessive force claim stemming from Irwin and Gilbreath's conduct at the time of his initial arrest was "temporally and conceptually distinct" from the conduct underlying Ramos' criminal conviction. Construing the well-pleaded allegations in Ramos' favor, as the Court is obligated to do at this stage, the Court infers that Ramos spat on Gilbreath *after* Defendants Irwin and Gilbreath tackled him. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 311 (5th Cir. 2002). This inference is reasonable given Ramos' allegations that "[m]ere seconds passed between the time when Irwin exited his police vehicle and the time when Gilbreath helped him tackle Ramos to the ground." Compl. ¶ 47. Therefore, a judgment in Ramos' favor on his § 1983 excessive force claim related to the tackling would not be inconsistent with his state criminal conviction. The facts underlying the excessive force claim and state criminal charge represent two entirely distinct events.

Turning to his second excessive force claim (related to the hogtying), Ramos alleges that the officers placed him in the back of a police vehicle, put a spit mask on him, and *later* removed him from the car and hogtied him. *Id.* at ¶¶ 59, 68, 70–76. Ramos' criminal misconduct had necessarily concluded when Defendants hogtied him, because at that point, he was wearing a spit

mask that would have prevented him from spitting on Gilbreath. Therefore, the factual bases for Ramos' excessive force claim connected to the hogtying, and for his criminal conviction, are "temporally and conceptually distinct." *Bush*, 513 F.3d at 497. His excessive force claim is not *Heck*-barred.

    **B. Whether Defendants are entitled to qualified immunity**

All five officers argue that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is Plaintiff's burden to establish that the doctrine of qualified immunity does not apply. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). To do so, Plaintiff must (1) allege facts sufficient to "make out a violation of a constitutional right," and (2) show that the constitutional right "was clearly established at the time of [the official's] alleged misconduct." *Heckford v. City of Pasadena*, No. 4:20-CV-04366, 2022 WL 209747, at *3 (S.D. Tex. Jan. 21, 2022) (Ellison, J.) (quoting *Pearson*, 555 U.S. at 232).

A constitutional right is "clearly established" if no reasonable officer would have thought the officer's acts passed constitutional muster. In other words, "qualified immunity is warranted unless no reasonable officer would have acted as the officer did." *Heckford*, 2022 WL 209747, at *3 (Ellison, J.) (citing *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019)). A right is clearly established so long as it provides "fair warning"; that is, it can be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated

constitutional rights." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)); *see also White v. Pauly*, 580 U.S. 73, 79 (2017) (explaining that there need not be "a case directly on point" for a right to be clearly established so long as "existing precedent [has] placed the statutory or constitutional question beyond debate" (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015))). Indeed, the Supreme Court has emphasized that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question" even where facts of the case at hand do not closely align with relevant precedent. *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (quoting *Hope*, 536 U.S. at 741).

1. **Personal involvement**

As a preliminary matter, to overcome qualified immunity, Ramos "must specifically identify each defendant's personal involvement in the alleged wrongdoing." *Jimerson v. Lewis*, No. 22-10441, 2024 WL 640247, at *3 (5th Cir. Feb. 15, 2024) (quoting *Thomas v. Humfield*, 32 F.3d 566, 1994 WL 442484, at *5 (5th Cir. 1994)). Defendants correctly assert that Ramos' complaint alleges that only Gilbreath and Irwin tackled and arrested Ramos, *see* Compl. ¶¶ 37–49, and that only Dago, Smith, and Morrison hogtied Ramos, *see id.* at ¶¶ 70–76. Accordingly, the Court concludes that Defendants' Motions to Dismiss should be **GRANTED IN PART**. Ramos' "tackling" excessive force claim and false arrest claim are **DISMISSED** with respect to Defendants Dago, Smith, and Morrison; Ramos' "hogtying" excessive force claim is **DISMISSED** with respect to Defendants Gilbreath and Irwin.

2. **False arrest**

Count I of Ramos' complaint alleges that Irwin and Gilbreath arrested him without probable cause. Compl. ¶¶ 85–92. The Complaint alleges that the officers lacked probable cause because (1) at the time of the initial arrest, the only information that Irwin and Gilbreath had was

9

that a 911 caller stated that a "Hispanic male" assaulted a "Hispanic" woman on the street; and (2) they did not ask Ramos any investigative questions before arresting him. *Id.* at ¶ 16, 30, 39, 40–49, 55–57.

### a. Constitutional violation

The Court agrees with Ramos that Irwin and Gilbreath lacked probable cause at the time of the arrest.[4] A suspect's race and sex alone cannot provide reasonable suspicion—and, thus, not the higher standard of probable cause[5]—for an officer to stop them. *United States v. Alvarez*, 40 F.4th 339, 343 (5th Cir. 2022) (concluding that officer lacked reasonable suspicion to stop Defendant, explaining that "[o]ur cases require officers to have information more specific than 'a Hispanic male who once rode away from police on a bicycle with large handlebars in a particular area,' especially in Corpus Christi, Texas."). This conclusion is buttressed by the fact that 44.8% of people in Houston identify as Hispanic or Latino. *U.S. Census Bureau Quickfacts: Houston City, Texas*, UNITED STATES CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/houstoncitytexas/RHI725222. Condoning Ramos'

---

[4] In their reply briefs, Defendants appear to argue for the first time that Ramos was not arrested until after he spit on Gilbreath, and that Irwin and Gilbreath's stopping, grabbing, tackling, and handcuffing of Ramos only constituted a *Terry* stop that can be supported by "reasonable suspicion," rather than "probable cause." *See* ECF Nos. 22, 31. Defendants' reply briefs also raise the argument that, in addition to Ramos' race and sex, his geographic and temporal proximity to the alleged crime, and apparent intoxication, support a finding of reasonable suspicion. *Id.* However, "[f]ailure to raise an argument in a motion waives the argument; raising it for the first time in a reply memorandum is too late." *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 795, 811 (E.D. Tex. 2014) (collecting cases); *cf. Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief. . . . It robs the [opposing party] of the opportunity to demonstrate that the record does not support [movant's] factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result."). In any event, even if Defendants made these arguments in their Motions, they would fail. Construing all reasonable inferences in Ramos' favor, the arrest occurred prior to any alleged resistance. Moreover, for reasons discussed *infra*, even if the initial interaction were a *Terry* stop and not a full-blown arrest, Irwin and Gilbreath's conduct nevertheless violated the Fourth Amendment, as they lacked reasonable suspicion. Case law is clear that race, sex, and geographic and temporal proximity to a crime do not give rise to reasonable suspicion. And Defendants did not observe that Ramos was under the influence of drugs until after he was tackled and handcuffed. *See* Compl. ¶ 64–65 (noting officer's observations following the initial take-down); *see also id.* at ¶¶ 23, 40 (noting that Irwin did not observe Ramos committing any crimes before grabbing him).

[5] Facts that do not give rise to reasonable suspicion also do not give rise to probable cause, as "[r]easonable suspicion is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990).

arrest would be akin to ratifying the open-ended policing practices that decades of Fourth Amendment jurisprudence have sought to stamp out. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 22 (1968).

Rather than contesting this well-established precept, Defendants argue that Ramos' act of resisting arrest supplied probable cause for the arrest. Defendants point to the state Magistrate Judge's determination that there was probable cause to arrest Ramos based on his conduct during his encounter with the officers, and urge the Court to apply the independent-intermediary doctrine. That doctrine provides that an arresting officer has not violated the Fourth Amendment where an independent intermediary authorized the arrest, even if the officer lacked probable cause. *Shaw v. Villanueva*, 918 F.3d 414, 417 (5th Cir. 2019); *Winfrey v. Rogers*, 901 F.3d 483, 496 (5th Cir. 2018). The rationale behind this doctrine is that, in such a scenario, the independent intermediary's authorization "breaks the chain of causation for false arrest, insulating the initiating party." *Mayfield v. Currie*, 976 F.3d 482, 486 (5th Cir. 2020) (quoting *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009)).

Defendants' arguments mischaracterize the facts as alleged in Ramos' complaint. Ramos alleges that Irwin and Gilbreath arrested him almost immediately after seeing him on the street, based only on the fact that he was a "Hispanic male." Compl. ¶ 16, 30, 39, 40–49, 55–57. The charges—and the Magistrate Judge's probable cause finding—focused solely on Ramos' actions that *followed* his initial arrest. *See* ECF No. 12-1 at 11 (Probable Cause Finding and Order describing order of events as "Ofc. Apprehend. def resists"). Under the alleged facts, no independent intermediary can be said to have broken the causal chain. Ramos has alleged facts sufficient to make out a violation of a constitutional right, thereby satisfying the first prong of the qualified immunity analysis.

### b. Clearly established law

Ramos has also demonstrated that his Fourth Amendment right is clearly established. At the time of Ramos' arrest, decades of Fifth Circuit precedent[6] had made clear that race and sex alone cannot support a police stop, let alone an arrest. *See Alvarez*, 40 F.4th at 343; *Goodson v. City of Corpus Christi*, 202 F.3d 730, 737 (5th Cir. 2000) (suspect matching description of "tall, heavy-set, white man dressed as a cowboy" did not give officer reasonable suspicion to stop and frisk); *United States v. Jones*, 619 F.2d 494, 497 (5th Cir. 1980) (suspect matching description of "black male, 5 feet 6 inches to 5 feet 9 inches tall and weighing between 150 and 180 pounds, with a medium afro hair style, who was wearing jeans and a long denim jacket" did not supply

---

[6] Defendants submit that only Supreme Court precedent can "clearly establish" constitutional rights for purposes of qualified immunity. Defendants point to *D.C. v. Wesby*, where the Supreme Court noted, "[w]e have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity." 583 U.S. 48, 66 n.6 (2018). While the Supreme Court has not explicitly held that circuit authority may clearly establish the law, it has "assum[ed] without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503, 202 L. Ed. 2d 455 (2019). And, the Fifth Circuit has consistently applied its own precedent to assess whether the law is clearly established the law in qualified immunity analyses. *See, e.g.*, *Aguirre v. City of San Antonio*, 995 F.3d 395, 415 (5th Cir. 2021) (citing *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017)); *Brown v. Lynch*, 524 F. App'x 69, 81 (5th Cir. 2013); *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006).
  In addition to precedential support, practical considerations militate in favor of relying on binding circuit authority in qualified immunity analyses. Paradoxical situations could ensue if only Supreme Court precedent could "clearly establish" constitutional rights. For instance, circuit courts might uniformly hold that certain conduct violates a constitutional right. The lack of a circuit split would disincentivize the Supreme Court from taking up a case that would align it with lower courts and "clearly establish" the law. A troubling situation would then result: courts would invariably agree that certain officer behavior violates the constitution, but all officers who have engaged in that behavior would be entitled to qualified immunity and insulated from the demands of the federal constitution.
  Further, from July 2022 to June 2023, the Fifth Circuit issued just over 2,700 opinions. U.S. CT. OF APPEALS FOR THE FIFTH CIR., JUDICIAL WORKLOAD STATISTICS, CLERK'S ANNUAL REPORT 11 (2023), https://www.ca5.uscourts.gov/docs/default-source/default-document-library/clerk's-annual-report-july-2022-to-june-20232041ab0547c26210bd33ff0000240338.pdf?sfvrsn=9883c92d_0. In roughly that same time period, the Supreme Court issued only 141 opinions. *The Statistics*, 137 HARV. L. REV. 490 (2023) (compiling Court statistics from October 2022 through October 2023). Necessarily, then, the Supreme Court has spoken, and will speak, on far fewer factual scenarios, as compared with circuit courts. Given the Supreme Court's instruction to conduct qualified immunity analyses at a low level of generality, *Mullenix*, 557 U.S. at 12, if binding circuit authority could not clearly establish constitutional rights, it would be nearly impossible to find cases that could provide officers "fair warning" that various conduct violates the constitution.
  Therefore, it accords with precedent and reason for this Court to rely on Fifth Circuit authority to assess whether Ramos' constitutional rights were clearly established for purposes of qualified immunity.

probable cause for arrest); *United States v. Rias*, 524 F.2d 118, 119, 121 (5th Cir. 1975) (suspects fitting description of "two black males in a black or blue Chevrolet" did not provide officer reasonable suspicion to stop vehicle). Defendants are not entitled to qualified immunity on Ramos' false arrest claim.

### 3. Excessive force

Count III alleges that Defendants used excessive force when they grabbed and tackled Ramos after he peacefully complied with Irwin's command to stop moving. *Id.* at ¶¶ 100–105. Count II of Ramos' complaint alleges that Defendants used excessive force against Ramos when bringing him out of the back of a police vehicle and hogtying him. Compl. ¶¶ 93–99.

Individuals have a Fourth Amendment right to be free from excessive force in the course of an investigatory stop or arrest. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Tennessee v. Garner,* 471 U.S. 1, 7–22 (1985); *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005). To sustain a claim for excessive force under § 1983, a plaintiff must plead an "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (quoting *Tarver*, 410 F.3d at 751). While excessive force claims need not allege "significant injury," "the injury must be more than *de minimis*." *Tarver*, 410 F.3d at 752 (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir.1999)).

The elements of an excessive force claim tend to blend in practice: the Fifth Circuit has explained that an injury is more than *de minimis* if it is objectively unreasonable, such that "even relatively insignificant injures and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Brown*, 524 F. App'x at 79. Courts measure the excessiveness and unreasonableness of the force "from the perspective of a

13

reasonable officer on the scene," *Smith v. Heap*, 31 F.4th 905, 912 (5th Cir. 2022) (quoting *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020)), based on "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396.

### a. Initial take-down

#### i. Constitutional violation

Ramos' complaint alleges that Irwin grabbed Ramos and, with Gilbreath's assistance, tackled and sat on him, immediately after Ramos complied with Irwin's order to stop moving. Compl. ¶ 33–48. Defendants submit that Ramos' excessive force claim fails because any injuries Ramos suffered as a result of the initial encounter were *de minimis*. However, Ramos' complaint alleges that, following this initial encounter (and before he was hogtied), he was "confused, distressed, in pain, and scared," and that the "emotional delirium" resulting from the take-down "appeared to have physical effects on his body," as he was "sweating profusely" and his breathing began to alternate "between hyperventilating and slow, labored, coarse-sounding breaths." *Id.* at ¶¶ 50, 64. The Court cannot assess the legal significance of these injuries in a vacuum. As noted, an injury that may appear minor in isolation is nevertheless cognizable if it is the result of an officer's objectively unreasonable use of force. *Brown*, 524 F. App'x at 79; *Freeman*, 483 F.3d at 416 ("The determination of whether a plaintiff's alleged injury is sufficient to support an excessive force claim is context-dependent and is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" (quoting *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir.1996))). Therefore, to assess whether Ramos' injuries from the initial

encounter are constitutionally cognizable, the Court must assess whether Irwin and Gilbreath's use of force was objectively unreasonable.

Here, all three *Graham* factors cut in Ramos' favor. First, at the time Irwin and Gilbreath took down Ramos, he had not committed a crime; he was merely walking on a public sidewalk. Compl. ¶¶ 22–23. Second, Ramos complied with Irwin's command to stop moving, and "showed no physical aggression" toward Irwin. *Id.* at ¶¶ 33–35. Therefore, he did not pose a threat to the safety of the officers. Lastly, Ramos was not resisting or evading arrest when Defendants grabbed and tackled him. To the contrary, Ramos had just complied with Irwin's command and stopped moving. *Id.* Any resistance that occurred *after* Irwin and Gilbreath grabbed and tackled Ramos cannot factor into the Court's analysis.

All in all, the *Graham* factors lead the Court to conclude that Irwin and Gilbreath's use of force was objectively unreasonable, and that Ramos' resulting injuries were more than *de minimis*. Therefore, Ramos has adequately pled a constitutional violation.

### ii. Clearly established law

The Fifth Circuit has repeatedly stated that an officer may not pull someone to the ground if they are only passively resisting—it follows that an officer may not pull someone to the ground if they are *not* resisting. *See Trammell*, 868 F.3d at 341 (explaining, "where an individual's conduct amounts to mere 'passive resistance,' use of force is not justified"); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (holding that it was clearly established "that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor [offense]").

In a case particularly instructive here, the Fifth Circuit held that an officer was not entitled to qualified immunity where the officer stopped the plaintiff for speeding, and then tackled the plaintiff to the ground even though he was not evading or resisting arrest. *Aguilar v. Robertson*, 512 F. App'x 444, 450 (5th Cir. 2013). The court explained that, though there was no case with directly analogous facts, "the law is clear that once the plaintiff stops resisting or is in the deputy's control, the permissible degree of force lessens." *Id.* The *Aguilar* court cited *Bush v. Strain*, an earlier case in which the Fifth Circuit held that it is clearly established that "forcefully slam[ming] [an individual's] face into a vehicle while she was restrained and subdued" violates the Fourth Amendment. 513 F.3d at 502.

To be sure, these cases have slight factual differences from Ramos'—the *Aguilar* plaintiff was riding a motorcycle and had committed a traffic violation when pulled over, while Ramos was on foot and had committed no crime when stopped; the officer in *Bush* slammed the plaintiff's face into a vehicle, while Irwin and Gilbreath tackled Ramos to the ground. However, the deluge of authority[7] and obviousness of the violation is such that no reasonable officer in Irwin and Gilbreath's position would have concluded that it was constitutionally permissible to grab and tackle an individual to the ground where the individual had committed no crimes and

---

[7] Defendants' citation to *Tucker v. City of Shreveport* is inapposite. 998 F.3d 165 (5th Cir. May 18, 2021). There, an officer pulled the plaintiff to the ground, despite the fact that that the plaintiff did not appear to demonstrate significant physical resistance to arrest. *Id.* at 180–81. The Fifth Circuit determined that the plaintiff's constitutional right to be free from excessive force was not clearly established. However, the *Tucker* court based its holding on a number of factors that are not present in this case. In granting qualified immunity at the summary judgment stage, the *Tucker* court pointed out that, (1) the plaintiff was visibly agitated at the time of the take-down such that the officers were concerned for their safety—for instance, he moved his arms in erratic and unpredictable ways, and shouted a series of angry, strident remarks at the officers, including "perceived racism, interspersed with cursing"; and (2) video footage and officer testimony indicated that the plaintiff tensed up and moved away from the officers as they attempted to handcuff him. *Id.* at 179. Under those circumstances, the *Tucker* court concluded that applicable precedent did not provide "fair warning" to the officers that pulling the plaintiff to the ground would violate his Fourth Amendment rights. *Id.* at 180. By contrast, at the time of the take-down in this case, Ramos stood still, and showed no signs of agitation or verbal or physical resistance. Compl. ¶¶ 34–37. Given these significant factual differences, the *Tucker* court's reasoning does not extend to the facts of this case.

immediately complied with orders. Therefore, Defendants Irwin and Gilbreath are not entitled to qualified immunity on Ramos' excessive force claim.

### b. Hogtying

#### i. Constitutional violation

Here, the only contested issue is whether Ramos suffered any injury from being hogtied that was more than *de minimis*. Defendants attempt to draw parallels to cases in which the Fifth Circuit found that minor wrist swelling from tight handcuffs was only a *de minimis* injury that could not support § 1983 liability. *Tarver*, 410 F.3d at 751–52; *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).

This suggestion that Ramos alleges only *de minimis* injuries strains credulity. Ramos alleges that when Defendants first attempted to hogtie Ramos, he "screamed in pain." Compl. ¶ 74. After Defendants succeeded in hogtying him, Ramos alleges that he had trouble breathing, suffered severe bruising and injury to his arm and ribcage, and ultimately had to be hospitalized for the injuries Defendants inflicted. *Id.* at ¶ 80–82, 8. To this day, Ramos continues to suffer "long-term mental and emotional consequences" as a result of being hogtied. *Id.* at ¶ 8. Moreover, Defendants hogtied Ramos (1) after he was already handcuffed and wearing a spit mask in the back of a police vehicle, while eleven officers were present on the scene, and (2) while he appeared to be under the influence of an unknown drug, and in a fragile physical and mental state. *Id.* at ¶¶ 61, 63–76.

Under these circumstances, Ramos' injuries were more than *de minimis*, and the force Defendants used was objectively unreasonable. While the first *Graham* factor perhaps cuts in Defendants' favor, as the crime at issue—harassment of a public servant—is a Third Degree Felony, the other two weigh overwhelmingly in favor of Ramos. When Defendants hogtied

Ramos, he was restrained in the back of a police car, and was outnumbered eleven to one. At that point, Ramos did not pose a threat to the safety of the officers or others, and was unable to resist or evade arrest. *Cf. Goode v. Baggett*, 811 F. App'x 227, 232 (5th Cir. 2020) (hogtying individual who was unarmed and handcuffed, and outnumbered five to one, was objectively unreasonable). Thus, the Court concludes that Ramos' complaint adequately pleads that Defendants Dago, Smith, and Morrison used excessive force in violation of the Fourth Amendment.

### ii. Clearly established law

The Court also concludes that Ramos' right to be free from excessive force was clearly established in this case. In 1998, the Fifth Circuit asserted that "the combination of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke holds . . . violated law clearly established prior to November 1994." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998). Within the past four years, and prior to Ramos' incident with Defendants, the Fifth Circuit reaffirmed the principle that hogtying an individual who appears to be under the influence of drugs violates a clearly established constitutional right. *Goode*, 811 F. App'x at 232; *Aguirre*, 995 F.3d at 420 (citing *Gutierrez* and holding that officers used excessive force when they placed individual in "maximal prone restraint position" that was "tantamount to and as dangerous as a hog-tie" where individual "was not resisting, posed no immediate safety threat, and was presenting reasons to believe he was on drugs and in a drug-induced psychosis").

In this case, despite clear indications that Ramos was under the influence of drugs, Defendants Dago, Smith, and Morrison hogtied him. *See* Compl. ¶¶ 64–66 (alleging that Defendant Irwin stated out loud that "he thought Mr. Ramos' mental state was deteriorating" and that "he thought Mr. Ramos might be experiencing an overdose"; and that subsequent incident

reports and probable cause determinations noted that Ramos "appeared to be under the influence of some unknown drug"). *Guitierrez*, *Goode*, and *Aguirre* all stand for the proposition that it violates an individual's constitutional rights to hogtie them when there is reason to believe they are on drugs. Each case standing alone could have supplied Defendants with "fair notice" that their conduct was unconstitutional; together, the three cases uncontrovertibly provided such notice. Therefore, Ramos has shown that the violative nature of the officers' conduct was clearly established at the time of the incident. Defendants Dago, Smith, and Morrison are not entitled to qualified immunity on Ramos' excessive force claim.

## IV. CONCLUSION

For the forgoing reasons, Defendants' Motions to Dismiss (ECF Nos. 12, 16, 29) are **DENIED IN PART**. Ramos' "tackling" excessive force claim and false arrest claim are dismissed with respect to Defendants Dago, Smith, and Morrison. Ramos' "hogtying" excessive force claim is dismissed with respect to Defendants Gilbreath and Irwin. Ramos' remaining claims may proceed.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 18th day of March, 2024.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE